ROBERT J. CAREY AND ALFRED J. CAREY, JR.,
D/B/A ALFRED J. CAREY & SONS

*vs.*

LEO BOULETTE AND ALDORA BOULETTE
AND WATERVILLE SAVINGS & LOAN ASSN.

Cumberland.   Opinion, June 22, 1962.

*Jerome G. Daviau,* for plaintiff.

*Roland J. Poulin,*
*Robert Marden,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, SIDDALL, JJ.

SIDDALL, J.   On appeal.   This is a complaint to enforce a lien claim brought by attachment under the provisions of R. S., 1954, Chap. 178, Sec. 45, as amended by P. L., 1959,

Chap. 317, Sec. 396. The complaint was brought by the plaintiffs, hereafter called the Contractors, against the defendants Leo Boulette and Aldora Boulette, hereafter called the Mortgagors, and also against the Waterville Savings and Loan Association, hereafter called the Association. The Contractors claim a lien on certain property located on Silver Street in Waterville, upon which property the Association held a mortgage given to it by the Mortgagors. The Contractors, between September 8, 1960, and January 25, 1961, furnished labor and materials on said property under an oral contract with the Mortgagors with the alleged knowledge and consent of the Association. The case was tried before a jury, and the jury found for the Contractors against the Mortgagors in the sum of $20,000, and a lien for that amount against said property having priority over the mortgage to the extent of said $20,000. The Mortgagors waived their right to appeal, and the Association appealed from the jury verdict.

One of the claims of the Association is that the jury erred as a matter of law in finding that the lien claim of the Contractors took priority over the mortgage of the Association to the extent of $20,000.

R. S., 1954, Chap. 178, Sec. 34 provides that "whoever performs labor or furnishes labor or materials or performs services * * * * * * in altering, moving, or repairing a house * * * * * * by virtue of a contract with or by consent of the owner, has a lien thereon and on the land on which it stands and on any interest such owner has in the same, to secure payment thereof, with costs."

R. S., 1954, Chap. 178, Sec. 35 provides that "If the labor, materials or services were not furnished by a contract with the owner of the property affected, the owner may prevent such lien for labor, materials or services not then performed or furnished, by giving written notice to the person per-

forming or furnishing the same that he will not be responsible therefor."

No claim is made that the Association is not an owner of the property within the meaning of the statute. We are aware that in some jurisdictions it has been held that a mortgagee not in possession is not an owner within the provisions of an applicable lien statute. Under the particular wording of our statute we consider that a mortgagee, in or out of possession, is an owner of the mortgaged property to the extent of his mortgage interest. This is conceded by the Association in oral argument.

The question before us is whether, under the terms of the statute, the materials and labor were furnished by consent of the Association within the meaning of the statute, and if so, to what extent.

Prior to 1868, a lien would attach only when labor and materials were furnished "by virtue of a contract with the owner." P. L., 1868, Chap. 207, provided that a lien would attach if the labor and materials were furnished "by consent of the owner." This legislation also provided that such a lien would not attach unless the owner was notified, and contained a provision that the owner could prevent the attachment of the lien by giving notice. The provision requiring notice to the owner by the lienor was stricken from the lien law by the provisions of P. L., 1876, Chap. 140. Under our present law it is not incumbent upon the lienor to notify the owner of the performance of labor or the furnishing of materials, and the owner may prevent the lien by giving notice of nonresponsibility.

Our court stated in *Shaw* v. *Young*, 87 Me. 271, 276, that this change materially modified the meaning of the word "consent" in favor of the lien claimant. Our court has also held that while the lien statute is to be construed somewhat liberally to accomplish the beneficial purpose, the rights of

the owner should be fairly protected. *Hanson* v. *News Publishing Co.*, 97 Me. 99, 53 A. 990.

We do not find that our court has passed upon the question of what constitutes "consent of the owner" under a factual situation similar to that in the instant case. Many of the cases in which this question has arisen are cases in which repairs or improvements have been made by a lessee, or by a person in possession of property under a contract of purchase. It has been impossible for our court to lay down any rule applicable in all cases. It has been generally held that whether consent appears in any given case depends wholly upon the facts in that case. *Greenleaf & Sons Co. et al.* v. *Shoe Co.*, 123 Me. 352, 123 A. 36; *Shaw* v. *Young, supra; Morse* v. *Dole*, 73 Me. 351. In *Morse* v. *Dole, supra,* to be discussed later in this opinion, it was stated that the claim of one who furnished labor and materials in a building may be inferior or superior to the mortgagee's lien according to circumstance.

In many cases involving consent of an owner under the lien statute our court has been careful to state that the decision must be regarded as based upon and limited by the facts of the particular case then being decided.

It appears clear that in order to subject the interest of the owner of property to a lien claim the owner must at least have knowledge that labor and materials are being furnished. Without such knowledge he cannot protect his property by giving the statutory notice. *Corey Co.* v. *Cummings Construction Co.*, 118 Me. 34, 39, 105 A. 405; *Morse* v. *Dole, supra.* Whether more than such knowledge is necessary depends upon the circumstances of the case.

In several cases our court has approved the following quotation from 2 Jones on Liens, Sec. 1253: "Consent within the meaning of the statute means something more than mere acquiescence. It implies an agreement to that which

could not exist without such consent." *Greenleaf & Sons Co.* v. *Shoe Co., supra; Corey Co.* v. *Cummings Construction Co., supra; Hanson* v. *News Publishing Co., supra.* We believe that the definition of consent in each of these cases applies only to the facts presented in that case. An examination of these cases discloses that the contract for labor and materials was made by a lessee and that the owner had no right to object to the work being done. It is noted that the owner in none of these cases appeared to be an affirmative factor in bringing about the contract for the work done, or participated in the improvements being made.

A review of some of our cases which involve the consent of an owner may be helpful.

In *Maxim* v. *Thibault*, 124 Me. 201, 126 A. 869, the owner leased a hall for a period of five years. The lease provided that all repairs should be done by and at the expense of the lessee. The evidence established that the lessors, or one of them, knew the purpose for which the hall was leased, and that extensive alterations and reconstruction of the interior of the fourth floor and exits were in progress to fit the property for the purpose intended, and that he was consulted about the changes. On page 203 of this case the court said:

> "from general knowledge alone that repairs were contemplated and were being made, the consent of the lessor is not to be inferred, so as to charge his interest with a lien, but the evidence must go to the extent of showing knowledge of what work was actually being done and that it was more than mere preservation repairs."

It was held that the consent of the owner must be inferred from the language of the lease, their knowledge of what was contemplated and actually being done, and their *conduct.*

In *Greenleaf & Sons Co.* v. *Shoe Co., supra*, a lien was claimed against the land and buildings of the owners by virtue of a contract between the lien claimant and the lessee

who had agreed to make all repairs inside and outside during the term of the lease. The labor and materials went into somewhat extensive alterations of the building. The court found no adequate evidence tending to prove that the owner of the building had any explicit information as to the nature and extent of the repairs beyond ordinary repairs being made in his building. The lien against the owner was denied. We note that in a concurring opinion Justice Morrill stated that there was nothing in the conduct of the owner to justify the expectation and belief that he had consented to the making of the repairs and alterations on the credit of the building.

In *Corey Co.* v. *Cummings Construction Co., supra,* a lien was denied against the property of the owner for materials used in the construction of an addition to a mill made under contract with a lessee. The lease provided that the building being erected should remain personalty and not become a part of the realty and could be removed at the expiration of the lease. The court took occasion to state that although the owner knew that the building was being erected, it could not prevent its erection; that it did not participate in the improvement nor was it an affirmative factor in procuring the erection of the addition to the building. Under such circumstances the owner did not consent but only acquiesced in that which he could not prevent.

In *York* v. *Mathis*, 103 Me. 67, 68 A. 746, the owner leased a certain building by written lease "to be used as a skating rink." The plaintiff, by contract with the lessee, performed labor in re-laying a portion of the floor found to be in an unsuitable condition for skating. The new floor was laid with the intention of making it a permanent improvement to the building. It would have been valueless for removal by the lessee. The building with the floor thus repaired continued to be used as a skating rink after the expiration of the lease. The floor before being repaired was unsuitable

for a skating rink. The president of the owner corporation was present the next day after the work started, observed the workmen, inspected the work as it progressed, and, in the presence of the plaintiff, made comments on it, but expressed no dissent or dissatisfaction. The court held that a ruling by the court below that the labor and materials were furnished "by consent of the owner" was not clearly erroneous.

In *Hanson* v. *News Publishing Co., supra,* the owner leased a store. The lessee, for his own convenience, put up certain removable partitions into the leased premises. The partitions were actually removed by the lessee. The owner saw the partitions being put in but gave no express consent, nor made any objections, except that they should not be nailed to the ceiling. The court found that no consent was given by the owner and a lien claim against him for the work performed was denied.

In *Baker* v. *Waldron,* 92 Me. 17, the principal defendant was in possession of land under agreement to sell on part of owner. The agreement provided that the principal defendant should build a dam across a stream running through the land and erect a mill at one end of the dam. The plaintiff furnished labor and materials for the foundation and asks a lien on the foundation and land. The court held that the owner of the land must be considered as assenting to the purchasing of materials and the hiring of labor for the purpose of erecting the contemplated mill, inasmuch as the contract of sale of the land between him and the principal defendant, who hired the plaintiff's services, made it a condition of the sale that the principal defendant should erect the mill.

In *Shaw* v. *Young, supra,* several persons were the owners of property constructed as a hotel and used for that purpose for a number of years. One of the owners appeared

to have been the managing owner. The property was leased for a term of years by an instrument under which the lessor was obligated to make the necessary outside repairs and the lessee the necessary inside repairs. The lease was assigned by consent of the managing owner. At that time the building needed repairs inside and out, repairs necessary for the preservation of the building and to keep up its earning power. The managing owner and the assignee of the lease talked over the matter of the repairs at the time of the assignment, and it was understood that the assignee was to have the necessary repairs made inside and out. The assignee employed the plaintiff to make the repairs. The managing owner and another owner lived at the hotel during a portion of the time the repairs were being made, saw the repairs going on, and more or less directed and approved them. The proper preservation of the hotel required that it be kept in good repair. The court held that the statutory consent sufficiently appeared. The court said: "This decision, however, should not be extended beyond the facts in this particular case. Consent may be inferred for ordinary preservative repairs, when it would not be inferred for alterations, remodeling, additions, or even more extensive repairs. The consent must be shown, and whether it appears in any given case will depend wholly upon the facts in that case."

In *Morse* v. *Dole, supra,* a lien was claimed against the interest of the mortgagee of property upon which labor was performed and materials furnished under contract with the mortgagor. The court found there was no evidence that the mortgagee had any knowledge whatever, at the time of the rendering of the services or of the delivery of the materials for which the lien was claimed, and the lien claim against the interest of the mortgagee was denied. While this decision was based upon a lack of knowledge of the work being done on the mortgaged property, the court took

occasion to discuss the lien statute in its relation to mortgaged property. Beginning on page 353 of the case the court said:

"The lien can hold against such a mortgagee, only in cases where he has become a party to the delivery of the materials, or to the work done, by consent tacitly or expressly given. The law was so declared in *Cocheco Bank v. Berry,* 52 Maine, 293, 304, cited for the respondents, and no change in this respect was intended by the later acts, nor by the revision of 1871. The contract or consent of the owner must go along with the delivery of the materials to give the lien, and when these are made part of a mortgaged estate, at least the knowledge of the mortgagee must in some way appear, before the written notice mentioned in R. S., c. 91, sec. 28, (amended 1876, c. 140,) can be required from him in order to prevent a later claim from taking precedence of the mortgage. It is only to the extent that the mortgagor is the owner, within the meaning of R. S., c. 91, Sec. 27, that his consent can give the lien; that is to say, only within the limits of a mortgagor's interest."

Although this decision was based upon a lack of knowledge on the part of the mortgagee of the work being done on the mortgaged premises, the case carries an inference that more than mere knowledge may be necessary under some circumstances to charge the mortgaged property with a lien. The case does not describe the conditions under which, by tacit consent, a mortgagee may become a party to the delivery of materials or the work done.

"But after the analogy of implied contracts or agreements inferred from the conduct of parties and the circumstances of the case, if one furnished labor and materials for making permanent repairs on a building, in the belief that the owner has given his consent thereto and in the expectation that he will have a lien therefor on the building and the conduct of the owner, viewed in the light

of all the circumstances, justified such expectation and belief, the basis of a lien is thereby established as effectually as by a mutual understanding between the parties to that effect." *York* v. *Mathis, supra,* 76, 77.

Having these decisions in mind the Contractors, in the instant case, in order to show consent on the part of the Association and thus establish the priority of their lien over that of the mortgage, had the burden below of proving (1) knowledge on the part of the Association of the nature and extent of the work being performed on the mortgaged premises, (2) conduct on the part of the Association justifying the expectation and belief that it had consented to the making of the alterations on the credit of the building.

A mechanic's lien cannot have priority over the mortgage without knowledge on the part of the Association of the nature and extent of the work being performed on the mortgaged premises. With such knowledge the conduct of the Association will be examined to ascertain whether in the light of all the circumstances there is any basis for subordinating the mortgage to the lien claim, and if so, to what extent.

Viewed in the light most favorable to the Contractor, the Association had knowledge that certain alterations, to cost between $5,000 and $7,000 according to an estimate given by the Contractors, were to be made by the Contractors upon the Silver Street property under Mortgage to the Association. Robert J. Carey, one of the Contractors, testified that his estimate was based upon the cost of remodeling the downstairs apartment into a home and living quarters for the Mortgagors. On direct examination Mr. Carey testified as follows:

"Q. Now, did Mr. Boulette and Mrs. Boulette, as you went along, indicate that they wanted work done differently than you had first discussed?

A. The entire job was different than what we first discussed."

He also testified that although his estimate was strictly for alterations on the downstairs apartment, that during the progress of the work the Mortgagors made certain changes, and ordered alterations on the second and third floors. The alterations on the second and third floors appear to have been extensive. A careful examination of the record fails to indicate that the Contractors or the Mortgagors brought to the attention of any officer of the Association that changes had been made in the work originally contemplated. The testimony also discloses that no officer of the Association visited the premises during the progress of the work. The changes made after the first estimate were considerable. The first estimate was between $5,000 and $7,000 and the final bill was over $21,000. It also appeared at one stage of the work, the exact date of which is not clear, there was an estimate that the cost of the work performed at that time was between $10,000 and $12,000. No information was given to the Association at the time of this estimate that changes had been made in the work originally contemplated.

We reach the conclusion that a jury would be justified in charging the Association with knowledge of the alterations contemplated in the first estimate, and that there is no justification for charging the Association with knowledge of work not contemplated therein.

Did the conduct of the Association taken in the light most favorable to the Contractors, under all the circumstances of the case, justify the expectation and belief on the part of the Contractors that the Association had consented to the making of the alterations on the credit of the building? If so, to what extent was the consent given?

The Association is a Loan and Building Association and the authority of its officers is governed by R. S., 1954, Chap. 59, Secs. 158 to 188 inc.

"Loan and building associations are creatures of statute, and it follows that the statutes which give them being must be followed so far as provisions for their existence, powers, rights and liabilities, as well as the rights and liabilities of their members are concerned. In respect to those matters where no provisions are made, the general principles of law and equity will prevail." *Bank Commissioner* v. *Loan Association*, 126 Me. 59, 62.

"A single trustee or director has no power to act for the institution that creates his office, except in conjunction with others. It is the board of directors only that can act If the board of directors or trustees makes a director or any person its officer or agent to act for it, then such officer or agent has the same power to act, within the authority delegated to him, that the board itself has." *Fairfield Savings Bank* v. *Chase*, 72 Me. 226, 227, 228.

The evidence in the case discloses that Napoleon J. Marshall was an officer of the Association. No evidence was produced tending to show that any specific authority had been delegated to him by the Board of Directors, or that he had been held out as having authority to make loans, or that any act on his part had been ratified by the Board of Directors. The Contractors claim that there was an understanding that the Association would release the Carver Street property from the terms of the mortgage, when sold, and that the proceeds of the sale if sufficient to cover the cost of the alterations would be paid to the Contractors. The evidence that any such understanding existed on the part of the Association is extremely vague and indefinite. In any event such an agreement was clearly beyond the authority of any single officer, and cannot be considered as being binding on the Association.

There was considerable evidence of conversations between Leo Boulette, one of the Mortgagors, and Robert J. Carey, one of the Contractors. Any agreement between

these parties, or any impression gained by the Contractors from these conversations, was not binding upon the Association. Likewise, impressions or understandings on the part of the Contractors of the position of the Association have no evidential weight unless substantiated by evidence of the facts upon which they were based. The Association was bound only by its own agreements, or, in the instant case, by its conduct viewed in the light of the surrounding circumstances.

In analyzing the conduct of the Association it must be borne in mind that it was not a party to the contract between the Mortgagors and the Contractors. It did not attempt to direct any part of the work being done or to inspect the premises during the progress of the alterations. Its position was that of a mortgagee to whom a request had been made by the Mortgagors for an additional loan. It becomes important to determine whether the Contractors were justified in believing that the Association, by express agreement or by conduct, undertook, on the strength of the mortgage, to make an additional loan for the full cost of the improvements, or whether it undertook to make a loan limited in amount.

The Contractors took no part in the discussion between Leo Boulette and Mr. Marshall. We do not have much insight into those discussions because the Contractors' counsel objected to any testimony in relation thereto.

We quote from the testimony of Robert Carey on cross-examination:

"Q    Mr. Carey, I believe your testimony was that you would not have proceeded on this job if it were not for the conversations with Mr. Marshall of the Bank?

A    Yes, sir.

Q  I must have missed something in your direct testimony because I don't recall that you told us exactly what those conversations were.

A  My first, when I sent Mr. Boulette to see Mr. Marshall about getting an addition to the mortgage that he had, I asked Mr. Marshall if Mr. Boulette could have an appointment with him; he said he could. I saw Mr. Marshall the next day about the same thing and he made an appointment for, I think, four o'clock one afternoon for an addition from five to seven thousand dollar mortgage for the repairs, he told me, of remodeling at that time.

This testimony indicates that the Association was to be asked to make an additional loan of from $5,000 to $7,000. The jury would have been justified in finding that Mr. Marshall, after talking with Mr. Boulette, discussed the situation with the proper Board of the Association, and in finding that they were willing to make an additional loan to the Mortgagors of from $5,000 to $7,000 to pay for the alterations. We have gone over the entire record with care. Viewing the conduct of the Association most favorably to the Contractor, it appears that a jury would be justified in finding that the Association was willing to make a loan in the amount of the *estimated cost* of the alterations, and that the Contractors, before starting work, were justified in believing this loan would be made. There is in the case, however, no credible evidence from which a reasonable inference can be drawn that the Association would make a loan for the *actual cost* of the alterations if it exceeded the maximum amount of the first estimated cost.

The Contractors never kept the Association informed of the cost of the work being done. Sometime in November or December, the exact date of which is not clear, the Contractors found that the estimated cost of the work then done was between $10,000 and $12,000. It is fair to assume that changes, unknown to the Association, had been made at

that time. That estimate exceeded the previous estimate, and the parties were faced with an entirely new problem. There is no credible evidence in the case from which can be drawn any reasonable inference that the Association gave any assurance that it would make a loan to the Mortgagors in a sufficient amount to meet the new situation. Without such assurance, the Contractors thereafter proceeded with the work at their peril. The Mortgagors did make an application for a loan of $12,000, apparently after the alterations were completed. The application was denied. Even at that time the Association was not informed that the cost of the improvements exceeded the maximum amount of the second estimate by almost $10,000.

The case presents an unfortunate situation because the Contractors furnished substantial services and materials which added considerable value to the building. The cost of the improvements was far in excess of the anticipated cost. The Contractors themselves were surprised when they ascertained the actual cost of the alterations. The responsibility for the situation that arose is clearly that of the Contractors. The cost of the alterations was either grossly underestimated, or the subsequent changes in the work materially increased the contract cost. In either event the Association is without fault. If the Contractors had intended to hold the property for a lien having priority over the mortgage to the extent of the cost of the improvements, they should have had a clearer understanding with the Association as to its position. The situation that now confronts the Contractors might have been avoided had they kept the Association informed as the work progressed of the cost of the improvements, and of additions and changes made after the first estimate.

The presiding justice left for jury determination the question of whether consent was given by the Association for the full amount of the work done or only for a part thereof.

He was not requested by counsel to place a limitation on such a consent. The jury, however, was clearly wrong in finding consent for improvements to the extent of $20,000 and in finding a lien priority of that amount in favor of the Contractors. The maximum amount of a priority under the evidence given in this case was $7,000.

Under the circumstances of this case it was not necessary for the Association to give the notice provided for by R. S., 1954, Chap. 178, Sec. 35. Lack of notice is no substitute for consent, and the consent of the Association upon the evidence presented in this case is limited to the amount specified herein.

> *If the plaintiffs remit all of the lien judgment against the defendant, Waterville Savings and Loan Association, in excess of $7,000.00, within thirty days after the rescript in this case is filed, the appeal is denied; otherwise the appeal of Waterville Savings and Loan Association is sustained.*