2012 ME 124

# JIM'S PLUMBING AND HEATING, INC., et al.

v.

# HOME LOAN INVESTMENT BANK et al.

Supreme Judicial Court of Maine.

Argued: Sept. 12, 2012.
Decided: Nov. 6, 2012.

Brendan P. Reilly, Esq. (orally), Jensen Baird Gardner & Henry, Portland, for appellant Home Loan Investment Bank.

Graydon G. Stevens, Esq. (orally), Kelly, Remmel & Zimmerman, Portland, for appellees Jim's Plumbing & Heating, Inc., Westbrook Tools, Inc., and James Michaud.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

SILVER, J.

[¶ 1] Home Loan Investment Bank (the Bank) appeals from a judgment entered in the Superior Court (Cumberland County, *Warren, J.*) following a bench trial that confirmed the validity of the mechanic's liens, 10 M.R.S. § 3251 (2011), to Jim's Plumbing and Heating, Inc., (Jim's Plumbing) and Westbrook Tools, Inc., (Westbrook Tools) against Bedford Falls Associates, LLC, (Bedford Falls) for work performed at a commercial property in Gorham. The Bank argues that the court erred as a matter of law and fact by concluding that the liens have priority over two mortgages granted to Bedford Falls for the acquisition and renovation of the property because it did not consent to the work performed by Jim's Plumbing or Westbrook Tools. We affirm the judgment.

## I. BACKGROUND

[¶ 2] In early 2007, Michel Salvaggio, as owner and president of Bedford Falls, applied to the Bank[1] for a loan in order to purchase a former church in Gorham and develop it as a commercial site. As part of the loan application, Bedford Falls submitted a business plan stating that it planned to "remodel and renovate" a 125–year–old church, along with its addition built in the 1960s, into a deli/cafe, sports bar, banquet center, and holistic wellness center. In this plan, Bedford Falls requested $330,000 to purchase the land and building and an additional $150,000 line of credit for renovations.

[¶ 3] The Bank approved the loan for $535,000, allowing $330,000 to purchase the property, $183,000 for renovations, and $22,000 for other start-up costs, and the parties closed on the loan on April 30, 2007. Near the time of closing, the then-chairman and Chief Executive Officer of the Bank visited the property, interviewed Salvaggio, and considered the merits of the transaction. At the time of closing, the Bank recognized that renovations were necessary to convert the building from a church to a commercial space that included kitchens and a bar.

[¶ 4] After the closing on the loan, Salvaggio contacted Jim Michaud to arrange for his company, Jim's Plumbing, to perform the plumbing and heating, ventilation, and air conditioning (HVAC) work for the project. Michaud also owned another corporation, Westbrook Tools, which he

1. The Bank's current name is Home Loan Investment Bank. At the time of the loan application the Bank's name was Ocean Bank. Prior to becoming Ocean Bank, the Bank was named Home Loan and Investment Bank.

formed more than twenty years prior to this project. Michaud provided plumbing and HVAC labor and material through Jim's Plumbing for the deli/cafe, sports bar, and banquet center and provided general contracting services for the banquet center through Westbrook Tools.

[¶ 5] Between April and August 2007, Salvaggio provided the Bank with evidence of payment for completed work in the form of general invoices that did not name the entities that performed the work. The Bank fully disbursed the entire $183,000 held in escrow for renovations by August 24, 2007. Salvaggio and the Bank closed on a second loan in the amount of $200,000 on October 4, 2007. The Bank fully disbursed the loan on the same day, which included an itemized disbursement of $8,033.13 to Jim's Plumbing. The Bank was aware of this itemized disbursement.

[¶ 6] The first of the planned businesses, the deli/cafe, opened in the spring of 2008. Michaud did not receive any compensation for the labor and materials he provided for the deli/cafe, except for the $8,033.13 payout from the Bank and payment from Salvaggio himself for five HVAC units. In order to induce Michaud to continue work, Salvaggio asked the Bank to send Michaud a letter saying that "financing is currently being processed and once complete, it is anticipated that the business will generate enough cashflow to service expenses incurred during the construction period and going forward." The Bank sent this letter, dated March 28, 2008, despite its understanding that only $1115 remained to be disbursed from the approved loans. Based on this letter, Michaud believed that money would come in and he would eventually get paid.

[¶ 7] In May 2008, Bank representatives met with Salvaggio to discuss a plan to complete the project. The Bank commissioned a project status report from an independent company, which found that the work was progressing but that the project was already substantially over budget. The report included expenses associated with each contractor; specifically, it stated that Jim's Plumbing was owed $52,696.79 and it predicted that Jim's Plumbing would need an additional $40,000 to complete the project. Westbrook Tools was not involved with the project at that time.

[¶ 8] After Jim's Plumbing started work on the banquet center part of the project, Salvaggio told Michaud that the project was in financial trouble. Salvaggio convinced Michaud to continue working on the banquet center and to use Westbrook Tools as a general contractor for the project. Michaud financed the renovations, in part by taking out a $100,000 line of equity on his home, and did much of the work himself.

[¶ 9] On December 18, 2008, representatives from the Bank visited the property. They determined that the banquet center would be completed once the sports bar was finished. The Bank estimated that the sports bar was forty-five to sixty days away from being complete and operational, and it would be approximately six months before the banquet center would be ready for business.

[¶ 10] Salvaggio manipulated Michaud into continuing to work without getting paid, through both Jim's Plumbing and Westbrook Tools, by telling him a series of lies regarding potential financing and lawsuits. Many of the lies involved promises of a fictitious $400,000 loan, which Salvaggio never took steps to obtain. Michaud became increasingly concerned about ever being paid, and Salvaggio finally promised that the $400,000 loan would close on March 18, 2010. Salvaggio told Michaud that he needed to sign a release or the bank would not issue the loan. Michaud

signed the release, which discharged Bedford Falls and Salvaggio from any claims associated with the project, including claims "relating to all labor and material expenses incurred from work performed." At that point Michaud had not been compensated for $155,405.16 worth of labor and materials provided by Jim's Plumbing or $135,662.70 provided by Westbrook Tools. The Westbrook Tools money covers the total amount it paid out for subcontractors and materials. The trial court found that the release was procured by fraud and therefore invalid.

[¶ 11] In early April 2010, Michaud revealed to Salvaggio that he was in serious financial trouble and would need to be paid in order to continue working. Following this conversation, on April 6, 2010, Michaud arrived at the property to find that the locks had been changed. Michaud was unable to enter the property to recover his tools and he did not return to the property.

[¶ 12] On April 21, 2010, Jim's Plumbing and Westbrook Tools gave notice and filed mechanic's liens in the amount of $155,405.16 and $135,662.70, respectively. Both companies and Michaud filed a complaint on July 19, 2010, with claims against Bedford Falls, Salvaggio, and the Bank, for breach of contract, mechanic's liens, quantum meruit, unjust enrichment, breach of warranty, fraud, conversion, punitive damages, and piercing the corporate veil. Bedford Falls and Salvaggio counterclaimed for breach of a lease that Salvaggio fraudulently encouraged Westbrook Tools to enter.

[¶ 13] Following a two-day bench trial in November 2011, the court entered judgment against Bedford Falls on the claims of breach of contract, quantum meruit, and fraud, and the court entered judgment against Bedford Falls on its counterclaims. The court ordered that Salvaggio would be jointly and severally liable for the judgments against Bedford Falls as its alter ego, and entered judgment against Salvaggio on the punitive damages claim. The court also ordered that Jim's Plumbing and Westbrook Tools were entitled to recover the full amounts of their liens—$155,405.16 for Jim's Plumbing and $135,662.70 for Westbrook Tools—and that the two liens had priority over the Bank's mortgages.

[¶ 14] The court specifically found that the Bank consented to the work performed by both entities. First, the court found that the Bank had knowledge of the work performed because it (1) knew of the planned renovations and that "most or all" of the separate businesses needed to be operating in order to make the project viable; (2) monitored progress through site visits and reports; (3) "expected and intended" that plumbing, HVAC, and other renovations would be provided by contractors; and (4) had "ongoing knowledge" of that work as it was being performed. Second, the court found that the Bank's conduct justified Michaud's belief that the Bank had consented because it (1) authorized approximately $8000 to be disbursed in October 2007 specifically for work that Jim's Plumbing performed; (2) received the May 2008 status report highlighting that significant sums were due for work already performed and additional obligations would be incurred for future work; and (3) "expressly participated in leading Michaud on" by supplying the March 2008 letter assuring him that further financing was being processed. Accordingly, the court found that the Bank had consented to the work performed, and awarded both liens priority over its mortgages.

## II. DISCUSSION

[¶ 15] The mechanic's lien statute provides:

Whoever performs labor or furnishes labor or materials ... or performs services as ... an owner-renter, owner-lessor, or owner-supplier of equipment used in ... altering ... or repairing a ... building or appurtenances ... by virtue of a contract with *or by consent of the owner*, has a lien thereon and on the land on which it stands and on any interest such owner has in the same, to secure payment thereof, with costs.

10 M.R.S. § 3251 (emphasis added). "For purposes of this statute, a mortgagee is considered an owner to the extent of its mortgage interest." *F.R. Carroll, Inc. v. TD Bank, N.A.*, 2010 ME 115, ¶ 9, 8 A.3d 646 (quotation marks omitted). We review the court's determination that the Bank consented to the labor and materials secured by the liens for clear error. *John W. Goodwin, Inc. v. Fox*, 1999 ME 33, ¶ 15, 725 A.2d 541. We review the trial court's application of law de novo. *Goudreau v. Pine Springs Rd. & Water, LLC*, 2012 ME 70, ¶ 11, 44 A.3d 315.

[¶ 16]  Where consent is not explicitly given, as here, it can be inferred from the circumstances. *Bangor Roofing & Sheet Metal Co. v. Robbins Plumbing Co.*, 151 Me. 145, 151, 116 A.2d 664 (1955); *see also Maxim v. Thibault*, 124 Me. 201, 203, 126 A. 869 (1924) ("The consent of the owners must be inferred from the language of the lease, their knowledge of what was contemplated and was actually being done, and their conduct."). To establish an owner's consent in the absence of a contract with the owner, the contractor is required to "prove (1) knowledge on the part of the owner of the nature and extent of the work being performed on the premises, and (2) conduct on the part of the owner justifying the expectation and belief on the part of the contractor that the owner had consented." *F.R. Carroll*, 2010 ME 115, ¶ 10, 8 A.3d 646 (quotation marks

and alterations omitted). "If these requirements are satisfied, a mechanic's lien may take priority over a previously-recorded mortgage." *Id.*

[¶ 17]  The Bank argues, first, that the court must limit its knowledge inquiry to the time period before the loan was disbursed, and, second, that it did not have specific knowledge of the work by Jim's Plumbing and Westbrook Tools. We disagree because the relevant time period for determining the owner's knowledge and conduct is both before the work has started *and* as the work progresses. *See id.* ¶¶ 5, 6, 14 (finding that the owner can gain sufficient knowledge to establish consent after the disbursement of the loan). Also, the Bank's knowledge of Jim's Plumbing and Westbrook Tools's labor and materials is sufficiently specific to infer consent. *See Gagnon's Hardware & Furniture, Inc. v. Michaud*, 1998 ME 265, ¶ 8, 721 A.2d 193 (requiring specific knowledge). Specific knowledge is only necessary with regards to the "nature and extent of the work being performed." *F.R. Carroll*, 2010 ME 115, ¶ 10, 8 A.3d 646 (quotation marks omitted). Whether the Bank consented is a fact-specific inquiry. *Carey v. Boulette*, 158 Me. 204, 207, 182 A.2d 473.

[¶ 18]  The Bank clearly had knowledge of Jim's Plumbing and Westbrook Tools's work. During the application process in April 2007, the Bank learned that Salvaggio intended to convert a 125–year–old church into several food service venues and a holistic wellness center. It necessarily understood that extensive renovations would be required to bring those plans to fruition, and specifically lent $183,000 for that purpose. In addition to reviewing the business plan, officers of the Bank made site visits before or at the time of the closing, and several times thereafter. In order to protect its mortgages'

priorities, the Bank could and should have required Bedford Falls to obtain lien waivers from all subcontractors prior to the disbursements and should have tailored its disbursements to those waivers. The Bank failed to take these protective steps, apparently relying solely on Salvaggio's reports before disbursing funds.

[¶ 19] Further evidence supports a finding of consent. For example, after both loans were disbursed, the Bank learned about the continued progress of the work from status reports that included detailed descriptions and pictures of the progress of the work and that specifically highlighted the electrical, plumbing, and HVAC work. In addition, officers of the Bank actually visited the project site in December 2008 and learned that the banquet center required more work to be complete and operational. Thus, the court had ample support for its finding that the Bank's knowledge was sufficiently specific at the time that it disbursed the loan and throughout the project. Additionally, the evidence shows that the Bank's conduct signaled to Michaud that it had consented to the work. At no point did the Bank object to the continuation of the project, despite its detailed knowledge of Salvaggio's debts and expenses.

[¶ 20] The Bank argues that it did not have specific knowledge to consent to Westbrook Tools's lien because it did not know that Westbrook Tools was involved with the project. We agree that the Bank may not have known the name of Michaud's other corporation, but we disagree that such detailed knowledge is necessary. The Bank was aware that the work was being performed, that Michaud's business was performing the work, and that Michaud had been encouraged *by the Bank* to continue to do the work. In light of the court's factual findings here, it was enough that the Bank was aware of the work

required to make the banquet center operational and Michaud's continued involvement with the project. Therefore, the trial court appropriately inferred that the Bank had sufficient knowledge of the nature and extent of Westbrook Tools's work.

The entry is:

Judgment affirmed.